IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 04–cv–00685–EWN–OES

JASON STEINBACH,

      Plaintiff,

v.

OMNI PROPERTIES,

      Defendant.

---

## ORDER MEMORANDUM OF DECISION

---

This is an Americans with Disabilities Act ("ADA") discrimination case. Plaintiff Jason Steinbach alleges that Defendant Omni Properties, Inc. violated the ADA by terminating him based upon his learning disability. This matter is before the court on (1) "Defendant's Motion for Summary Judgment," filed February 1, 2005; and (2) "Plaintiff's Motion for Leave to File Sur-Reply to Defendant's Motion for Summary Judgment," filed April 21, 2005. Jurisdiction is based on 28 U.S.C. § 1331 (2004).

## FACTS

### 1.    *Factual Background*

Plaintiff worked at Front Range Beverage Company ("FRBC") prior to his employment with Defendant. (Mot. for Summ. J. of Def. Omni Prop.; Br. in Supp. of Mot. for Summ. J. of

Def. Omni Prop., Statement of Undisputed Material Facts ¶ 17 [filed Feb. 1, 2005] [hereinafter "Def.'s Br."]; *admitted in relevant part at* Pl.'s Resp. to Def.'s Mot. for Summ. J., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 17 [filed Mar. 4, 2005] [hereinafter "Pl.'s Resp."].)  In September 1998, Coors Brewing Co. ("Coors"), purchased FRBC.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 19, Ex. A–22 at 2 [Dr. Mead's 12/10/00 Psychological Report]; *admitted in relevant part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 19.)  On May 28, 1999, Coors terminated Plaintiff for falsification of records.  (Def.'s Br., Ex. A–22 at 2 [Dr. Mead's 12/10/00 Psychological Report].)  Plaintiff filed an ADA employment discrimination suit against Coors following his termination.  (*Id.*, Statement of Undisputed Material Facts ¶ 20; *admitted in relevant part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 20.)

Approximately one month after Coors terminated Plaintiff, Defendant hired Plaintiff as the groundskeeper at Kimberly Woods, an apartment complex.  (*Id.*, Statement of Undisputed Material Facts ¶ 23; *admitted in relevant part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 23.)  Plaintiff's brother, Joseph Steinbach, Jr., was the maintenance supervisor at Kimberly Woods and supervised Plaintiff.  (*Id.*)  Defendant operates and manages Kimberly Woods.  (*Id.*, Statement of Undisputed Material Facts ¶ 24; *admitted in relevant part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 24.)  Kimberly Woods sits on approximately thirteen to fifteen acres and has approximately 242 units, nineteen buildings, and a clubhouse.  (*Id.*)

The basic function of the groundskeeper is to "maintain the community grounds."  (*Id.*, Ex. A–26 at 1–2 [Groundskeeper Job Description].)  The groundskeeper's responsibilities

include: (1) picking up trash, cigarette butts, and dog excrement throughout the community; (2) removing snow throughout the community; (3) keeping all the landings and stairways in good conditions; (4) maintaining the pool area; and (5) sweeping and painting the parking areas.  (*Id.*) Writing and reading are not essential functions of the groundskeeper position.  (*Id.*)

### *a.    Plaintiff's Disability and Plaintiff's Request for Accommodations*

Plaintiff asserts that he has a "developmental disability" that "significantly affects major life activities, including but not limited to severe difficulties in learning, reading and writing." (Compl. ¶ 6 [filed Apr. 6, 2004] [hereinafter "Compl."].)  Plaintiff does not have a complete understanding of his disability.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 48; Ex. A–43 at 37 [Dep. of Pl.].)

> Q.    What do you understand about what kind of disability you have?
> A.    I don't completely understand it.  I just know what effects or what I can't do with it.
>
> Q.    Are there any other things that you can't do, other than reading and writing and having a hard time remembering things?
> A.    There's some other stuff, but I can't remember what it was.

(*Id.*)  Plaintiff testified that he told Hope Kindler-Smith, the community manager at Kimberly Woods when Plaintiff was hired, that he had a hard time "reading and writing and remembering stuff."  (*Id.*, Ex. A–43 at 36 [Dep. of Pl.].)

> Q.    Did you tell [Kindler-Smith] that you needed special help in order to do the groundskeeper job?
> A.    I didn't tell her that.
>
> Q.    When did you tell Michelle Thomas that you had a disability?
> A.    I don't know the exact date when I told her.

Q.      Was it before or after you had the interview with [Kindler-Smith] and
        your brother?
A.      It was after that.

Q.      And what did you tell [Thomas]?
A.      I told her I had a hard time reading and writing and remembering lots of
        information, and remembering and stuff.

Q.      Anything else?
A.      I think that was it.  I can't remember if I told her anything else.

Q.      Did you tell Michelle that you needed special help in order to do the job as
        groundskeeper?
A.      I didn't tell her that.

(*Id.*, Ex. A–43 at 36–37 [Dep. of Pl.].)  Plaintiff testified that, with the exception of his brother,

he only spoke with Kinder-Smith and Thomas regarding his disability and accommodations.  (*Id.*)


Plaintiff's brother, does not know what Plaintiff's disability is:

Q.      What, if any, knowledge do you know of in connection with your
        brother's learning disability?  I'm just trying to find out what you know
        about his learning disability.
A.      I know he — all I know is he has a disability and, you know, I don't know
        — I don't know what his disability is, but I know it affects his reading.
        He's unable to read.  It affects his memory.  It affects his ability to retain
        information, a lot of information.

(*Id.*, Statement of Undisputed Material Facts ¶ 49, Ex. A–44 at 278 [Dep. of Joseph Steinbach,

Jr.].)

        Plaintiff's brother testified that he spoke with Kindler-Smith, and mentioned that

Plaintiff had a learning disability.  (*Id.*, Ex. A–44 at 93 [Dep. of Joseph Steinbach, Jr.].)

Q.      So my question is, What did you tell her about the learning disability?
A.      I just told her that he had a disability and that, you know, he had trouble
        reading and writing and that he was looking for a job and, you know, about
        getting him hired.

Q.	Did you tell her anything else other than your brother had trouble reading and writing?

A.	Just he's — I can't remember exactly what was said, but I remember talking to her about, you know — she just asked me about him, you know, and I can't remember exactly what I said, but —

Q.	Did you tell her he would be able to do the job?

A.	Well, I remember having a conversation with [Kindler-Smith] about [Plaintiff], and I knew he had a disability, and I thought he could do the job, and I just asked her if there was any problem with hiring him.

		* * *

Q.	And you said you told her he had trouble reading and writing, and I was trying to find out if there was anything else you told her about the nature of his learning disability?

A.	Trying to think. I really can't recall at this time right now. I just don't —

(*Id.*, Ex. A–44 at 97–99 [Dep. of Joseph Steinbach, Jr.].)  Plaintiff's brother told Kindler-Smith that Plaintiff had trouble retaining too much information.  (*Id.*, Ex. A–44 at 101 [Dep. of Joseph Steinbach, Jr.].)  Plaintiff's brother testified that he did not request an accommodation on behalf of Plaintiff (*Id.*, Ex. A–44 at 101 [Dep. of Joseph Steinbach, Jr.].)

Q.	So did you tell . . . Kindler-Smith anything about what types of special things you might need to do with respect to your brother so that he could do that job?

A.	I don't really recall any — I don't really recall.  I mean, I know we just — we've had conversation about it.  I mean, I just don't really recall what.

(*Id.*) Plaintiff's brother testified that Plaintiff asked him for an accommodation.

Q.	To your knowledge, . . . did your brother . . . ever ask anyone at [Defendant's company] for any special help or accommodations that he needed in order to do his job duties as groundskeeper?

A.	Yes.

Q.	And how do you know that?

A.	Well, he asked me.  I know that.

Q.	When did he ask you?

A.	When he was first — first hired.

Q.    And what special help or accommodations did he ask you for?
A.    He asked that he be — things that were written to be verbally told to him. I'm trying to think.  And I don't remember anything else at this time.

(Pl.'s Resp., Ex. A–62 at 263 [Dep. of Joseph Steinbach, Jr.].)

Plaintiff's brother only had one conversation with Kindler-Smith regarding Plaintiff's learning disability.  (Id., Ex. A–44 at 102 [Dep. of Joseph Steinbach, Jr.].)  Plaintiff's brother testified that he "told people that [Plaintiff] needed to only do one task at a time, and he didn't have — he couldn't remember if he was given more."  (Id., Ex. A–44 at 295 [Dep. of Joseph Steinbach, Jr.].)  Plaintiff's brother testified that he spoke with Diane Accardi, Defendant's District Manager, and Michelle Thomas, the community manager following Kindler-Smith's departure, about Plaintiff's disability sometime within Plaintiff's first year of employment and told them Plaintiff had a reading problem.  (Id., Ex. A–44 at 105 [Dep. of Joseph Steinbach, Jr.].)  Plaintiff's brother did not discuss Plaintiff's learning disability with any other person at Defendant's company other than Kindler-Smith, Accardi, and Thomas.  (Id., Statement of Undisputed Material Facts ¶ 54; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 54.)  Plaintiff's brother never communicated to Defendant that Plaintiff (1) was mentally retarded, (2) was diagnosed with limited intellectual development, (3) was socially phobic, or (4) had avoidant personality disorder with dependent traits.  (Id., Statement of Undisputed Material Facts ¶ 55; *admitted in relevant part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 55.)

Plaintiff's father testified that he informed Kindler-Smith that Plaintiff had a disability and Plaintiff would need "verbal instructions and he would have to have instructions, you know, for new tasks."  (Id., Statement of Undisputed Material Facts ¶ 56; *admitted in relevant part at*

Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 56.)  Plaintiff's father did not

communicate to Defendant that Plaintiff (1) had a developmental disability, (2) was mentally

retarded, (3) had been diagnosed with limited intellectual development, (4) had social phobia, or

(5) had avoidant personality disorder with dependent traits.  (*Id.*, Statement of Undisputed

Material Facts ¶ 57; *admitted in relevant part at* Pl.'s Resp., Resp. to Statement of Undisputed

Material Facts ¶ 57.)  Plaintiff's father told Kindler-Smith that Plaintiff would need "hands-on

training . . . right at first. [Plaintiff] would need verbal instructions. . . . [and] [h]e may need

occasionally to be retrained in something if there's any new task.  [Plaintiff] would definitely

need to be trained if there was a particular job he hadn't done before."  (*Id.*, Ex. A–46 at 77 [Dep.

of Joseph Steinbach, Sr.].)

Donavan Vigil became the maintenance supervisor, and Plaintiff's direct supervisor, at

Kimberly Woods when Plaintiff's brother left.  (*Id.*, Statement of Undisputed Material Facts ¶

115; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 115.) Plaintiff

testified that on occasion, he would ask Vigil for verbal instructions.  (*Id.*, Ex. A–43 at 134 [Dep.

of Pl.].)  Plaintiff testified that the only time Vigil didn't provide him with verbal instructions

was when Vigil was either busy or Vigil "didn't know what to do."  (*Id.*, Ex. A–43 at 134–35

[Dep. of Pl.].)

### b.    *Facts Leading To Plaintiff's Termination*

Defendant alleges that Thomas gave Plaintiff a verbal warning on May 23, 2001.  (*Id.*,

Statement of Undisputed Material Facts ¶ 99.)  Thomas allegedly discussed performance issues

such as failing to (1) complete the trash run, (2) pick up dog feces, (3) pick up cigarette butts,

and (4) clean parking spots and breezeways.  (*Id.*, Ex. A–41 at 147–49 [Dep. of Michelle

Thomas].)  Thomas memorialized this warning in a memorandum dated May 23, 2001.  (*Id.*, Ex. A–30 [5/23/01 Letter].)  Plaintiff alleges that he did not receive any verbal warning.  (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 99.)

On October 23, 2001, Thomas gave Plaintiff a written corrective action for unsatisfactory job performance.  (Def.'s Br., Ex. A–31 [10/24/01 Corrective Action].)  The corrective action stated that Accardi "visited the property on [October 23, 2001], the grounds were unacceptable. Dog feces in rocks, old pop cans [and] oil can [sic] in parking lot.  Leaves [and] pine needles on stairways and entry of 153 [and] 148 not clean." (*Id.*)  Plaintiff's brother's concerns about the corrective action did not pertain to Plaintiff's disability.

> Q.   So [Accardi] wasn't happy [sic] the way the grounds at the property looked at Kimberly Woods Apartments; would that be fair to say?
> A.   Yes, yes.
>
> Q.   And she was wanting to have [Plaintiff] disciplined in connection with things she thought were problems with the way the grounds looked, correct?
> A.   Yeah, I mean, yes.
>
> Q.   And you disagreed with her?
> A.   No, I didn't disagree with her.  I mean, she saying that he was — his job performance wasn't good, and I said it is good.
>
> Q.   It isn't good?
> A.   It is good.  He is doing his job.  And we explained that, you know, we got these stepping stones going.  You know, there's way too much work for one person to do.
>
> * * *
>
> Q.   You said before that you were commenting to [Accardi] about the reason the grounds were not up to her level of satisfaction was you needed more people.  Isn't that what you testified?
> A.   I believe I asked her we needed more, you know, help to get — if all the stuff she was asking to be done done [sic], yes.

\* \* \*

> Q.   Did you at any time during this conversation tell Diana Accardi or . . .
>       Thomas the reason those things you are concerned about are not done is
>       because my brother has a learning disability?
> A.    No, I don't think so.
>
> Q.   Nothing to that effect, correct?
> A.    No.

(Def.'s Br., Ex. A–43 at 37–39 [Dep. of Joseph Steinbach, Jr.].)  Plaintiff's brother did not

request any accommodation for Plaintiff to complete the groundskeeper job in connection with

the October 23, 2001 corrective action.  (*Id.*, Statement of Undisputed Material Facts ¶ 109;

*admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 109.)

On September 24, 2003, Accardi found the grounds in an unacceptable condition and she

called a meeting with Plaintiff's brother.  (*Id.*, Ex. A–44 at 194–96 [Dep. of Joseph Steinbach,

Jr.].)  Plaintiff's brother testified that he told Accardi "[t]here is no way one person can keep

this property clean to your — to your standards that you want done."  (*Id.*, Ex. A–44 at 196

[Dep. of Joseph Steinbach, Jr.].)  Plaintiff's brother testified that Accardi responded: "'[w]ell,

we've got a $25 million complex and we have to hire disabled people,' meaning [Plaintiff]."  (*Id.*,

Ex. A–44 at 197 [Dep. of Joseph Steinbach, Jr.].)  Following this meeting, Plaintiff's brother left

his employment at Defendant's company.  (*Id.*, Statement of Undisputed Material Facts ¶¶

113–14; *admitted in relevant part at* Pl.'s Resp., Resp. to Statement of Undisputed Material

Facts ¶¶ 113–14.)  The parties dispute whether Plaintiff's brother was fired or whether he quit.

(*Id.*)

Defendant alleges that Thomas gave Plaintiff a corrective action form on November 25, 2002, for failing to show up for snow removal. (*Id.*, Statement of Undisputed Material Facts ¶ 120, Ex. A–33 [11/25/02 Corrective Action].) The corrective action form states, "[f]ailure to show up for snow removal on Sunday, [November 24, 2002], you signed a memo dated [October 23, 2001], on snow removal. If it does not snow at your home you need to call supervisor for advice on the snow at Kimberly Woods." (*Id.*) Plaintiff did not sign the corrective action form. (*Id.*) Plaintiff contends that he was not given a corrective action for failure to show up for snow removal. (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 120.)

Defendant contends that Vigil gave Plaintiff a verbal warning regarding job performance problems on December 26, 2002, and December 27, 2002. (Def.'s Br., Statement of Undisputed Material Facts ¶ 122, Ex. A–34 [12/26/02 and 12/27/02 Memorandum by Donovan Vigil].) Vigil memorialized this warning in a memorandum. (*Id.*, Ex. A–34 [12/26/02 and 12/27/02 Memorandum by Donovan Vigil].) Defendants allege that Thomas gave Plaintiff a verbal warning on both of these days for failing to pick up dog feces, cigarette butts, and debris. (*Id.*, Statement of Undisputed Material Facts ¶ 123, Ex. A–57 [12/27/02 Memorandum by Michelle Thomas].) Thomas memorialized this warning in a memorandum. (*Id.*, Ex. A–57 [12/27/02 Memorandum by Michelle Thomas].) Plaintiff denies that Thomas and Vigil gave him verbal warnings. (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 122–23.)

Defendant asserts that on June 10, 2003, Thomas and Vigil informed Plaintiff of Accardi's plan to visit the property on the following day and Plaintiff should make certain the grounds were clean. (Def.'s Br., Statement of Undisputed Material Facts ¶ 132.) Plaintiff contends that he was not told on June 10, 2003, Accardi was going to visit the property on June

11, 2003. (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 132.) On June 11,

2003, Accardi inspected the property and determined that the grounds were unacceptable.

(Def.'s Br., Statement of Undisputed Material Facts ¶ 134; *admitted in relevant part at* Pl.'s

Resp., Resp. to Statement of Undisputed Material Facts ¶ 134.) Accardi observed dog feces,

trash littering the property, dirt and debris in the parking areas, a tree limb lying down in one of

the carports, and unpainted curb lines. (*Id.*, Ex. A–42 at 124–26 [Dep. of Diana Accardi].)

Thomas noticed similar deficiencies. (*Id.*, Ex. A–41 at 221–22 [Dep. of Michelle Thomas].)

Accardi and Thomas decided to terminate Plaintiff's employment based upon this inspection.

(*Id.*, Statement of Undisputed Material Facts ¶ 137, Ex. A–35 [Termination Notice], Ex. A–41 at

223, 254 [Dep. of Michelle Thomas], Ex. A–42 at 132 [Dep. of Diana Accardi].) The

termination notice stated:

> Accardi visited the property at Kimberly Woods [June 11, 2003], and was
> extremely dissatisfied of [sic] how the ground's carports and overall appearance of
> the property. [sic] Tree limbs hanging on carports, curb lines not painted, and
> debris in parking areas. The carports under [b]uilding [number two] have not been
> cleaned in a couple of weeks, buildup of dirt [and] debris.

(*Id.*, Statement of Undisputed Material Facts ¶ 138, Ex. A–35 [Termination Notice].) Despite

Plaintiff's contention to the contrary, the problems identified by Accardi and Thomas were all

within Plaintiff's job description. (*Compare* Pl.'s Resp., Resp. to Statement of Undisputed

Facts ¶ 138, *with* Def.'s Br., Ex. A–26 [Groundskeeper Job Description].)

**2.**     ***Procedural History***

On April 6, 2004, Plaintiff filed a complaint in this court. (Compl.) Plaintiff asserted

one claim for relief styled as "violation of the [ADA]." (*Id.* ¶¶ 18–24.) On July 12, 2004,

Defendant filed its answer. (Def. Omni Prop.'s Answer to Jason Steinbach's Compl. [filed July 12, 2004].)

On February 1, 2005, Defendant filed its motion for summary judgment. (Def.'s Br.) Defendant argues that Plaintiff is not a qualified individual with a disability because Plaintiff cannot perform the essential functions of the groundskeeper position with or without reasonable accommodation. (*Id.* at 36.) Defendant contends that even if Plaintiff is a qualified individual with a disability Plaintiff did not (1) specifically identify the nature and extent of his disability, and (2) request reasonable accommodations. (*Id.* at 38–43.) On March 8, 2005, Plaintiff filed his response to Defendant's motion for summary judgment. (Pl.'s Resp.) On March 31, 2005, Defendant filed its reply in support of its motion for summary judgment. (Reply in Supp. of Mot. for Summ. J. of Def. Omni Prop. [filed Mar. 31, 2005] [Def.'s Reply].) On April 21, 2005, Plaintiff filed a motion for leave to file a sur-reply to Defendant's reply in support of its motion for summary judgment. (Pl.'s Mot. for Leave to File Sur-Reply to Def.'s Mot. for Summ. J. [filed Apr. 21, 2005].) On May 11, 2005, Defendant filed a response to Plaintiff's motion for leave to file a sur-reply. (Def.'s Resp. to Pl.'s Mot. for Leave to File Sur-Reply [filed May 11, 2005].)

## ANALYSIS

### 1. *Standard of Review*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)

-12-

(2003); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Concrete Works, Inc.*

*v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the

initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the

burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material

matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325).  The

nonmoving party may not rest solely on the allegations in the pleadings, but must instead

designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S.

at 324; *see* Fed. R. Civ. P. 56(e).  "'Only disputes over facts that might affect the outcome of the

suit under governing law will preclude the entry of summary judgment.'" *Sanchez v. Denver*

*Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248).  The court

may consider only admissible evidence when ruling on a summary judgment motion.  *See World*

*of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  The factual record

must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.*,

36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238,

1241 [10th Cir. 1990]).

**2.**      ***Plaintiff's ADA Claim***

The burden shifting analysis established in *McDonnell Douglas v. Greene*, 411 U.S. 792,

802 (1973), generally applies to ADA disparate treatment claims.  *See Hardy v. S.F. Phosphates*

*Ltd. Co.*, 185 F.3d 1076, 1079 (10th Cir. 1999).  Under that analysis, Plaintiff carries the burden

of raising a genuine issue of material fact on each element of his prima facie case.  If Plaintiff

establishes a prima facie case, the burden shifts to Defendant to offer a legitimate

nondiscriminatory reason for its employment decision. *Id.* If Defendant articulates a

nondiscriminatory reason, the burden shifts back to Plaintiff to show a genuine issue of material

fact as to whether Defendant's reason for the adverse employment action is pretextual. *Id.* at

1079–80.

To establish a prima facie case under the ADA, Plaintiff must show: (1) he is disabled

within the meaning of the ADA; (2) he is qualified, that is, with our without reasonable

accommodation (which he must describe), he is able to perform the essential functions of the job;

and (3) that Defendant terminated him because of his disability. *White v. York Int'l Corp.*, 45

F.3d 357, 360–61 (10th Cir. 1995). Defendant does not dispute that Plaintiff has a disability

under the ADA that substantially limits one or more of his major life activities. (Def.'s Br. at 36

n. 6.) I need only address the second element.

The ADA defines a "qualified individual" as "an individual with a disability who, with or

without reasonable accommodation, can perform the essential functions of the employment

position that such individual holds or desires." 42 U.S.C. § 12111(8); *Davidson v. Am. Online,*

*Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003). To determine whether a person is qualified under the

ADA, the Tenth Circuit has promulgated a two part test. *Davidson*, 337 F.3d at 1190. First,

the court must determine whether the individual can perform the essential functions of the job.

*Id.* Second, "if (but only if) the court concludes that the individual is unable to perform the

essential functions of the job, the court determines whether any reasonable accommodation by

the employer would enable him to perform those functions." *Id.*

### a.   Essential Functions

Defendant argues that it is entitled to summary judgment because Plaintiff cannot perform the essential functions of the groundskeeper position.  (Def.'s Br. at 36.)  On January 8, 2003, five months before Defendant terminated Plaintiff's employment, Plaintiff's expert psychologist, Michael D. Mead, Ed.D, opined that Plaintiff was "unable to perform any work."  (*Id.*, Ex. A–9 [Dr. Mead's 1/8/03 Psychological Report].)  Specifically, Dr. Mead opined that:

> [b]ased upon my previous psychological evaluations of [Plaintiff], and upon review of my findings, I am of the opinion that [Plaintiff] continues to suffer from a debilitating mental disorder and *is unable to perform any work*.  He is unable to neither live on his own nor manage his own affairs and it totally reliant upon his parents, with whom he lives, to do this for him.

(*Id.* [emphasis added].)  Dr. Mead later supplemented his opinion in this letter with an affidavit stating that he "was referring to 'competitive employment' in that sentence, as opposed to 'sheltered employment.'"  (Pl.'s Resp., Ex. A–60 [Aff. of Michael Mead].)  Dr. Mead's January 8, 2003 letter and his supplemental affidavit show that Plaintiff cannot perform the essential functions of the groundskeeper position.

Dr. Mead opined that Plaintiff could only perform "sheltered employment."  (*Id.*, Ex. A–60 ¶ 3 [Aff. of Michael Mead].)  Sheltered employment refers to segregated vocational and non-vocational programs for individuals with disabilities.  (Def.'s Reply, Ex. A–82 [Sheltered vs. Supported Employment].)  Indeed, the regulations for social security disability benefits are instructive in this case.  The regulations draw a distinction between competitive and sheltered employment. *Zenker v. Bowen*, 872 F.2d 268, 270–71 (8th Cir. 1989); *Iamarino v. Heckler*, 795 F.2d 59, 60–61 (8th Cir. 1986).  Sheltered employment envisions a "sheltered workshop or comparable facility especially set up for severely impaired persons."  20 C.F.R. §

404.1574(b)(4).  Modifications an employer may offer to accommodate a plaintiff's injury or disability do not necessarily render the position "sheltered employment."  *See generally Iamarino*, 795 F.2d at 60–61; *see also Goodwill Indus. of Cent. Florida v. Heard*, 863 So.2d 389, 390–91 (Fla. Dist. Ct. App. 2003).  A reasonable job modification for the purpose of accommodating a partially disabled employee, will not, however, convert the job from competitive to sheltered employment.  *Id.*  Plaintiff's job in this case cannot be considered sheltered employment.  Thus Dr. Mead's opinion that Plaintiff cannot perform any competitive employment means that Plaintiff cannot perform the essential functions of his job as groundskeeper.

Further, Dr. Mead contends that "[Plaintiff can and] has successfully performed work when his disabilities were accommodated."  (Pl.'s Resp., Ex. A–60 ¶ 5 [Aff. of Michael Mead].)  Dr. Mead's opinion as to this point is mere speculation.  Dr. Mead does not have personal knowledge regarding whether Plaintiff successfully performed his work when his disabilities were allegedly accommodated.  An affidavit which is not based on personal knowledge is not enough to create a genuine issue of material fact sufficient to survive summary judgment. *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 n. 4 (10th Cir. 2004).  Indeed, Dr. Mead did not identify any specific accommodation that Plaintiff would require in order to perform his groundskeeper job.  (Def.'s Br., A–23 [Plaintiff's Disclosure of Expert Witness Michael Mead].)

Additionally, Defendant's position that Plaintiff cannot perform the essential functions of his position is bolstered by Plaintiff's multiple applications for social security disability in which he and his health care providers opine that Plaintiff is unable to perform any work.  (Def.'s Br., Ex. A–14 [11/18/96 Application for Social Security Disability Benefits]; A–17

[1/13/97 Request for Reconsideration of Social Security Disability Benefits]; Ex. A–56 [7/2/97

Daily Activities Questionaire]; Ex. A–36 [8/16/00 Work Activity Report]; Ex. A–40 [12/2/04

Disability Application].)  An ADA plaintiff's "sworn assertion in an application for disability

benefits that [he] is . . . 'unable to work' will appear to negate an essential element of [his] ADA

case . . . at least if [he] does not offer a sufficient explanation." *Cleveland v. Policy Mgmt. Sys.

Corp.*, 526 U.S. 795, 806 (1999).

On January 10, 1997, Plaintiff sought reconsideration of his previous denial of social

security disability benefits.  (Def.'s Br., Ex. A–17 [1/13/97 Request for Reconsideration of Social

Security Disability Benefits].)  Plaintiff's application for disability benefits stated that "I have

an anxiety disorder and basically a total inability to deal with people that keeps me from working

or even effectively applying for work." (*Id.*)  On January 10, 1997, Plaintiff reported in a

reconsideration disability report that "I believe I [am] totally disabled . . . I am very restricted in

trying to carry out activities or work — ike [sic] activities." (*Id.*, Ex. A–18 [1/10/97

Reconsideration Disability Report].)  In March 1997, in connection with Plaintiff's application

for social security disability, Dr. Mead opined that "[Plaintiff's] numerous mental disorders are

with [sic] the moderate to severe range, and cause severe vocational impairment.  For at least the

last year he has been totally disabled for all types of employment." (*Id.*, Ex. A–13 [3/1/97 Dr.

Mead's Psychological Report].)

On January 26, 1997, F. Bruce Merrill, M.D., evaluated Plaintiff at the request of the

social security disability determination services.  (*Id.*, Ex. A–19 [7/28/97 Dr. Merrill's

Psychological Evaluation].)  Dr. Merrill opined that "this patient is rather severely compromised

in his ability to do work-related activity, such as understanding and memory, sustained

-17-

concentration, apparently persistence, pace and social interaction." (*Id.*)  In July 1997, Plaintiff

reported to the social security disability administration that he has lost jobs in the past because

"[he] could not make any decisions on his own. [sic] Problems understanding what needed to be

done. [sic] Could not perform his duties." (*Id.*, Ex. A–56 [7/2/97 Daily Activities Questionaire].)

On July 30, 1997, the social security disability administration reversed its prior decision and

awarded Plaintiff social security disability benefits based on Plaintiff's social phobia, avoidant

personality disorder, and learning disability. (*Id.*, Ex. A–21 [Disability Determination and

Transmittal].)

Plaintiff remained unemployed and received social security disability benefits until

September 1997, when Plaintiff began working at FRBC. (*Id.*, A–22 [Dr. Mead's 12/10/00

Psychological Report].)  Coors purchased FRBC in 1998, and Plaintiff continued to work as a

Coors employee until his termination on May 28, 1999. (*Id.*)  Plaintiff sued Coors for

employment discrimination in May 2000. (*Id.*, Statement of Undisputed Material Facts ¶ 20;

*admitted in relevant part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 20.)

On December 10, 2000, in connection with Plaintiff's ADA employment discrimination lawsuit

against Coors and while Defendant employed Plaintiff, Dr. Mead prepared a psychological

report. (*Id.*, Ex. A–22 [Dr. Mead's 12/10/00 Psychological Report].)  Dr. Mead noted that "the

opinions I expressed in my previous report of [March 1, 1997] remain unchanged." (*Id.*)  In the

March 1, 1997 report, Dr. Mead opined that Plaintiff is "totally disabled for all types of

employment." (*Id.*, Ex. A–13 [Dr. Mead's 3/1/97 Psychological Report].)  In addition, Dr. Mead

opined that "[o]ver [Plaintiff's] lifetime, his self-esteem and self concept will continue to be

diminished, relative to how it was prior to his termination.  This will in turn further interfere

with his ability to find and maintain employment." (*Id.*, Ex. A–22 [Dr. Mead's 12/10/00 Psychological Report].)

Defendant hired Plaintiff in June 1999. (*Id.*, Statement of Undisputed Material Facts ¶ 23; *admitted in relevant part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 23.) On August 16, 2000, while Defendant employed Plaintiff, Plaintiff reported to the social security administration that his termination from Coors was "because of my disability," and "I cannot [sic] get any work in the past unless a friend or relative helps me and trains me because of my disability." (*Id.*, Ex. A–36 [8/16/00 Work Activity Report].) The form states "[p]lease use this form to describe your work activity since [January 2000]." (*Id.*) Plaintiff completed the application on August 16, 2000 and did not indicate that Defendant employed him at that particular time. (*Id.*) Plaintiff represented to the social security administration that he was totally disabled and eligible for benefits. (*Id.*)

On December 2, 2004, six months following Plaintiff's termination, Plaintiff filed another application for social security disability income. (*Id.*, Ex. A–40 [Social Security Disability Application.) Plaintiff asserted in his application, that his illness first prevented him from working on June 11, 2003, the date Defendant terminated Plaintiff's employment. (*Id.*)

The foregoing evidence, while not dispositive on its own, paints a clear picture regarding Plaintiff's inability to perform the essential functions of his job. Plaintiff and Plaintiff's treating physicians have consistently maintained that Plaintiff is incapable of working. Indeed, Plaintiff sought disability benefits during his employment with Defendant. (*Id.*, Ex. A–36 [8/16/00 Work Activity Report].) Statements by Plaintiff's own physician that Plaintiff is unable to work are

probative on whether Plaintiff can perform the essential functions of the job.  *Weiler v.*

*Household Fin. Corp.*, 101 F.3d 519, 525 (7th Cir. 1996).

Plaintiff contends that "[b]ecause the two regulatory schemes are different, plaintiff need

only explain differences between statements made under those schemes to survive summary

judgment." (Pl.'s Resp. at 56.)  To survive Defendant's motion for summary judgment, Plaintiff

must explain why his social security disability contention is consistent with his ADA claim that

he could "perform the essential functions" of his previous job, at least with "reasonable

accommodation." *Cleveland*, 526 U.S. at 797–98.  Plaintiff contends that he has not asserted

inconsistent claims.  (Pl.'s Resp. at 56.)  Plaintiff argues that "[w]hile there may have been times

in his life when he simply could not work, the relevant documents during the relevant time period

consistently show that he can work and did work satisfactorily when his disabilities were

accommodated." (Pl.'s Resp. at 58.)  Plaintiff's record of employment does not refute or explain

the inconsistency between his social security disability contention and his ADA claim that he can

perform the essential functions of his job.  Plaintiff continued to maintain his claim for social

security disability benefits while he worked for Defendant.  In fact, Plaintiff reported to the

social security administration that "I cannot [sic] get any work in the past unless a friend or

relative helps me and trains me because of my disability." (*Id.*, Ex. A–36 [8/16/00 Work Activity

Report].)  Plaintiff completed the application on August 16, 2000 and did not indicate his

present employment situation.  (*Id.*)  Plaintiff represented to the social security administration

that he was totally disabled and eligible for benefits.  (*Id.*)

Plaintiff's representation to the social security administration that in order to work he

needed to be trained and supervised by a friend or relative, cannot be reconciled with his ADA

claim that he can perform the essential functions of his job.  Under the ADA, a plaintiff is not entitled to a specific supervisor as an accommodation to perform the essential functions of his job.  *Weiler*, 101 F.3d at 526; *see also Woodman v. Runyon*, 132 F.3d 1330, 1340 (10th Cir. 1997).  Moreover, Plaintiff did not offer an explanation for his August 16, 2000 application for social security disability benefits.  Further, Plaintiff did not sufficiently reconcile his representation to the social security administration that he became disabled on the date Defendant fired him, yet, he was allegedly able to perform the essential functions of his job on that date.  Accordingly, Plaintiff has not demonstrated that he can perform the essential functions of his job.

### b.    *Reasonable Accommodation*

Next, I must determine whether any reasonable accommodation by Defendant would have enabled Plaintiff to perform the essential functions of his job.  To defeat Defendant's motion for summary judgment, Plaintiff must first demonstrate that an accommodation appears reasonable on its face.  *Mason v. Avaya Commc'n, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004).  Whether an accommodation is reasonable under the ADA is a mixed question of law and fact.  *Id.*  By the statutory language, "reasonable accommodation" is limited by the employer's knowledge of the disability.  *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998) (citing *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 [7th Cir. 1996]).  The federal regulations implementing the ADA "envision an interactive process that requires participation by both parties."  *Id.*  Plaintiff has a duty to provide Defendant with information on his medical condition as part of the ADA interactive process.  *Id.* at 619 n. 3.  Thus an employer cannot be held liable for failing to accommodate in the absence of an employee's request for accommodation.  *Maes v.*

*Henderson*, 33 F. Supp. 2d 1281, 1290 (D. Nev. 1999).  It is the employee's initial request for an

accommodation which triggers the employer's obligation to participate in the interactive process

of determining one.  *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996).

Further, the ADA requires only reasonable accommodations to the known physical or mental

limitations of the employee.  *Nicholson v. Boeing Co.*, 176 F.3d 489, No. 98–3058, slip op. at 6

(10th Cir. May 4, 1999) (table) (citing *Beck*, 75 F.3d at 1134).

 Plaintiff has not produced sufficient evidence that he, or his family members, specifically

identified the nature and extent of his disability or his need for accommodations.  First, Plaintiff

does not have a complete understanding of his disability.  (Def.'s Br., Ex. A–43 at 37 [Dep. of

Pl.].)  Plaintiff did not provide Defendant with information on his medical condition.  (*Id.*, Ex.

A–43 at 36 [Dep. of Pl.].)  Plaintiff testified that he told Kindler-Smith that he had a hard time

"reading and writing and remembering stuff."  (*Id.*)

> Q. Did you tell [Kindler-Smith] that you needed special help in order to do
>   the groundskeeper job?
> A. I didn't tell her that.
>
> Q. When did you tell Michelle Thomas that you had a disability?
> A. I don't know the exact date when I told her.
>
> Q. Was it before or after you had the interview with [Kindler-Smith] and
>   your brother?
> A. It was after that.
>
> Q. And what did you tell [Thomas]?
> A. I told her I had a hard time reading and writing and remembering lots of
>   information, and remembering and stuff.
>
> Q. Anything else?
> A. I think that was it.  I can't remember if I told her anything else.

> Q.     Did you tell Michelle that you needed special help in order to do the job as
>        groundskeeper?
> A.     I didn't tell her that.

(*Id.*, Ex. A–43 at 36–37 [Dep. of Pl.].)  Reading and writing are not essential functions of the job

as groundskeeper.  (*Id.*, Ex. A–26 at 1–2 [Groundskeeper Job Description].)  Plaintiff testified

that, with the exception of his brother, he only spoke with Kindler-Smith and Thomas regarding

his learning disability.  (*Id.*)  Viewing the facts in a light most favorable to Plaintiff, as I must,

Defendant did not have enough information regarding Plaintiff's disability to know of any

limitation that would effect Plaintiff's job as groundskeeper.

Second, Plaintiff's brother does not have a complete understanding of Plaintiff's

disability.  (Ex. A–44 at 278 [Dep. of Joseph Steinbach, Jr.].)  Plaintiff's brother never

communicated to Defendant that Plaintiff (1) was mentally retarded, (2) was diagnosed with

limited intellectual development, (3) was socially phobic, or (4) had avoidant personality disorder

with dependent traits.  (*Id.*, Statement of Undisputed Material Facts ¶ 55; *admitted in relevant*

*part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 55.)  Plaintiff's brother

testified that he spoke with Kindler-Smith when Plaintiff was hired and mentioned that Plaintiff

had a learning disability which impeded his ability to read, write, and retain too much

information.  (*Id.*, Ex. A–44 at 93 [Dep. of Joseph Steinbach, Jr.].)  Plaintiff's brother testified

that he did not request an accommodation on behalf of Plaintiff.  (*Id.*, Ex. A–44 at 101 [Dep. of

Joseph Steinbach, Jr.].)  Plaintiff's brother testified that he spoke with Accardi and Thomas

about Plaintiff's disability sometime within Plaintiff's first year of employment and told them

Plaintiff had a reading problem.  (*Id.*, Ex. A–44 at 105 [Dep. of Joseph Steinbach].)  Again,

reading and writing are not essential functions of the groundskeeper job.  (*Id.*, Ex. A–26 at 1–2

[Groundskeeper Job Description].)  Thus, Defendant did not have enough information from Plaintiff's brother to trigger its duty to determine an appropriate accommodation, if any at all.

Third, Plaintiff's father did not inform Defendant of the nature and extent of Plaintiff's disability, which would have triggered Defendant's obligation to provide Plaintiff with accommodations.  Plaintiff's father did not communicate to Defendant that Plaintiff (1) had a developmental disability, (2) was mentally retarded, (3) had been diagnosed with limited intellectual development, (4) had social phobia, or (5) had avoidant personality disorder with dependent traits.  (*Id.*, Statement of Undisputed Material Facts ¶ 57; *admitted in relevant part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 57.)  Plaintiff's father told Kindler-Smith that Plaintiff would need "hands-on training . . . right at first. [Plaintiff] would need verbal instructions . . . [and] [h]e may need occasionally to be retrained in something if there's any new task.  [Plaintiff] would definitely need to be trained if there was a particular job he hadn't done before."  (*Id.*, Ex. A–46 at 77 [Dep. of Joseph Steinbach, Sr.].)  Moreover, Plaintiff has not produced any evidence that Defendant failed to accommodate Plaintiff in this fashion.  Thus, Defendant did not have enough information from Plaintiff's father to trigger its duty to determine an appropriate accommodation, if any at all.  Accordingly, even assuming Defendant's conduct could support a claim under the ADA for failure to provide reasonable accommodation, that claim would only arise after Plaintiff satisfied his duty to notify Defendant of the nature of his disability. *See Templeton*, 162 F.3d at 619 n. 3.

Further, even assuming Plaintiff did sufficiently inform Defendant of the nature and extent of his disability, Plaintiff has not produced any evidence that Plaintiff requested an accommodation or that Defendant failed to accommodate Plaintiff's known limitations. *See*

*Nicholson*, 176 F.3d at *6 (a defendant is only required to accommodate a plaintiff's known disability and subsequent limitations).  Plaintiff and Plaintiff's brother testified that they did not request a reasonable accommodation for Plaintiff.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 109; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 109, Ex. A–44 at 101 [Dep. of Joseph Steinbach, Jr.], Ex. A–43 at 36–37 [Dep. of Pl.].)  While it is unclear whether Plaintiff's father's discussion with Kindler-Smith regarding Plaintiff's need for verbal instructions and hands on training is a request for accommodation, Plaintiff has not demonstrated that Defendant failed to accommodate Plaintiff in this manner.  Plaintiff asserts that during the time his brother was his supervisor, his brother accommodated Plaintiff's limitations and Plaintiff was able to perform the essential functions of his position.  (Pl.'s Resp. at 64; Compl. ¶¶ 11–14.)  On September 24, 2003, Plaintiff's brother left his employment with Defendant and Vigil became Plaintiff's supervisor.  (*Id.*, Statement of Undisputed Material Facts ¶ 115; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 115.)  Plaintiff testified that on occasion, he would ask Vigil for verbal instructions.  (*Id.*, Ex. A–43 at 134 [Dep. of Pl.].)  Plaintiff testified that the only time Vigil did not provide him with verbal instructions was when Vigil was either busy or Vigil "didn't know what to do."  (*Id.*, Ex. A–43 at 134–35 [Dep. of Pl.].)  Thus, viewing the facts in a light most favorable to Plaintiff, Plaintiff has not demonstrated a period of time in which Defendant did not accommodate Plaintiff's learning disability to the extent Defendant had knowledge of such disability and the resulting limitations.  *See Nicholson*, 176 F.3d at *6 (a defendant is only required to accommodate a plaintiff's known disability and subsequent limitations).  Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA claim.

-25-

*3.*     ***Conclusions***

Based on the foregoing it is therefore

ORDERED as follows:

1.  Defendant's motion for summary judgment (# 40) is GRANTED.

2.  Plaintiff's motion for leave to file a sur-reply (# 57) is DENIED as moot.

3.  The clerk shall forthwith enter judgment in favor of Defendant and against Plaintiff,

dismissing all claims with prejudice.  Defendant may have its costs by filing a bill of costs within

eleven days of the date of this order.

Dated this  _8th_  day of September, 2005.

BY THE COURT:


s/Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge